IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS ARTHUR APPLEGATE,<br><br>    Petitioner,<br><br>  vs.<br><br>KATHLEEN DICKENSON, Warden,<br><br>    Respondent. | No. C 10-04774 EJD (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

Petitioner has filed a pro se Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging a judgment of conviction from Humboldt County Superior Court. For the reasons set forth below, the Petition for a Writ of Habeas Corpus is **DENIED**.

**PROCEDURAL BACKGROUND**

In 2007, a jury convicted Petitioner of second degree murder and "second degree attempted murder." Resp. Ex. 6. The jury also found true that Petitioner personally and intentionally used a firearm which caused great bodily injury, and found that Petitioner was sane at the time of the offenses. Resp. Ex. 1 at 475-76, 569, 575. The state trial court sentenced Petitioner to a term of seven years to run

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.10\Applegate04774_deny petition-coa.wpd

consecutively to sixty-five years to life in state prison. Resp. Ex. 6 at 2.

On June 10, 2009, the state appellate court modified the abstract of judgment to reflect that Petitioner was convicted of attempted murder – "not second degree attempted murder" – and otherwise affirmed the judgment. Resp. Ex. 6 at 10. On August 26, 2009, the California Supreme Court denied review. Resp. Ex. 8.

Petitioner filed this instant petition for a writ of habeas corpus on October 22, 2010. Doc. #1.

## DISCUSSION

A.  Factual Background

The facts of Petitioner's underlying offenses were summarized in the state appellate court's opinion:

> On May 1, 2003, Applegate told his employer he was going to Mexico for four days. On May 3, 2003, he drove his Jeep from his home in Paso Robles to the airport in San Luis Obispo. He rented a gold Kia automobile, using his father's home address rather than his own.
>
> On May 4, 2003, Applegate checked into a motel in Ukiah. He telephoned his girlfriend's brother, Leon Osburn (Leon) [FN2] and Leon's wife, Jessie Osburn (Jessie), who lived in Ukiah. Applegate asked if they would like to go with him to look at some property. They agreed, and met Applegate at the motel. Leon saw the butt of a handgun on the nightstand in Applegate's motel room.
>
> FN2.  Because a number of individuals referenced in this opinion share the same last name, we refer to them by their first names, where appropriate, for clarity. (See Rubenstein v. Rubenstein (2000) 81 Cal.App.4th 1131, 1136, fn.1.)
>
> Leon and Jessie then went to their home, and Applegate met them there. Applegate told Leon: "I got a new prescription. You ought to try it." He then pulled out "a bag of speed," also known as "meth[amphetamine]." Leon testified: "[Y]ou give me a bag, I'll do it. I poured it out." Each man snorted one line of the drug. Leon testified that in his experience, when a person is on a "meth run," meaning taking methamphetamine over a period of time, he or she "think[s] a lot of crazy stuff."
>
> After approximately 15 minutes, Applegate, Leon and Jessie got into Applegate's rental car and he drove north on

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.10\Applegate04774_deny petition-coa.wpd

2

Highway 101. By the time the group stopped in Willits, Leon no longer felt the effects of the methamphetamine. The group then continued their journey north on Highway 101. They stopped in Leggett for two to three hours because the highway was blocked by a mudslide. Leon testified that Applegate started behaving strangely on the way to Leggett. During their stop in Leggett, Applegate engaged a stranger in an emotional conversation about forgiveness and religion. Jessie testified Applegate "wasn't himself," and "wasn't acting like . . . [she had] seen him before."

Leon did not know exactly where they were going until they arrived in Bridgeville, a small town with only four inhabited homes. Applegate had learned on the Internet that the entire town of Bridgeville was for sale, and he wanted to buy it. He parked the car across the street from what was later identified as Joey Church's home. Applegate approached the house, and spoke with Carrie Erickson, Church's girlfriend. He asked about the town being for sale. Erickson testified that Applegate "freaked [her] out," and "didn't seem like he was right in the head."

Applegate returned to the car, and the group drove away. Applegate said he wanted to go back, saying he "needed to help them." Leon told him he and Jessie would get out and get their son to give them a ride home, because Leon had to be at work the next morning. They called their son, then walked about five miles along the road until their son picked them up. He had driven about 120 miles to do so. Leon and Jessie both testified they were not apprehensive about Applegate, just tired and wanted to go home. Leon had not seen Applegate take any more methamphetamine that day.

Around 8:00 p.m., Applegate returned to the Church home. Church's neighbor, Ross Condemni, as well as Erickson, Church, and his seven-year-old daughter and 10-year-old son, had gathered to watch The Simpsons on television. Applegate knocked on the door, and Church and Erickson said to come in. Applegate asked if the house was for sale. Church responded it was not, but that the town was.

Applegate pulled out a gun from a holster inside his clothing. He said, "Nobody move. This is a. . . ." Condemni testified he thought the last word was "arrest" or "rip-off." Applegate told the children to go to the other room. Then he "started shooting." The two children and Erickson ran to a bedroom and climbed out the window, taking Church's .22 caliber rifle for protection. Church's daughter saw Applegate shoot Church. Applegate shot Condemni in the left thigh. Church died as a result of the gunshot wounds.

At about 2:00 or 3:00 a.m., Applegate entered Leon and Jessie's home in Ukiah without knocking. Their son was there watching television. Applegate appeared scared and confused, and was "all strung out, white as a ghost." When Leon got up the next morning at about 6:30 or 7:00 a.m., Applegate was not there.

> On May 6, 2003, Leon called police after learning on the Internet about the murder in Bridgeville. The description of the suspect and car matched Applegate and the Kia rental car. Condemni and Church's minor children identified a photograph of Applegate as the person who had shot Church.
>
> Police found a .44 magnum Colt Anaconda revolver at the home of Applegate's father, who testified that he took it from Applegate's home on May 7, 2003. Ballistics tests indicated the bullets fired at the Church home were from this gun.
>
> At the sanity phase of the trial, Applegate's mother testified he had suffered head injuries as a young child, and had emotional problems and signs of learning disabilities as a youth. He was employed in the oil industry for about 17 years. During that employment, he was involved in an explosion in about 1991. As far as his mother knew, he was never hospitalized for his childhood head injuries or after the explosion. Applegate began using other drugs in addition to marijuana in 1990 or 1991.
>
> Dr. William Pierce, a clinical psychologist, examined Applegate, conducted tests, and reviewed his records. He diagnosed Applegate with dementia, head trauma, amphetamine-induced psychosis and posttraumatic stress disorder. He opined that Applegate's condition, combined with methamphetamine use, rendered him incapable of distinguishing between right and wrong at the time of the crimes.
>
> Dr. Samuel Benson, a psychiatrist, also examined Applegate. A scan of Applegate's brain revealed "scalloping," a condition caused by long-term exposure to a toxin. Dr. Benson believed the scalloping was caused by Applegate's long-term methamphetamine use. He opined that Applegate met the legal definition of insanity, because he was "psychotic at the time [of the incident], responding to whatever the internal stimuli, the voices, were telling him to do." He believed that the psychosis was caused by the effect of the methamphetamine on Applegate's damaged brain. Applegate's symptoms at the time of the killings were not consistent with a person who had consumed only one line of methamphetamine, which in a normal person would not cause psychosis.
>
> Dr. Robert Soper, a psychiatrist, disagreed with Drs. Pierce and Benson, testifying that he believed Applegate was legally sane at the time he committed the crimes. Dr. Soper testified that Applegate did "something crazy like this virtually out of the blue . . . [due to] methamphetamine."

People v. Applegate, No. A118980, 2009 WL 1611724 at *1-*4 (Cal. Ct. App. June 10, 2009). Resp. Ex. 6.

B.  Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000).  The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412; Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004).  While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.10\Applegate04774_deny petition-coa.wpd

5

of the prisoner's case." Williams, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court considering a petitioner's claims, the court "looks through" to the last reasoned opinion. See Ylst, 501 U.S. at 805; Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, an independent review of the record is the only means of deciding whether the state court's decision was objectively reasonable. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

Recently, the Supreme Court vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions. See Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam); Harrington v. Richter, 131 S. Ct. 770, 783-85 (2011); Premo v. Moore, 131 S. Ct. 733, 739-40 (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011) (per curiam). As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions

be given the benefit of the doubt.'" Id. at 1307 (citation omitted). With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

C.   Claims and Analysis

Petitioner raises the following grounds for federal habeas relief: (1) his conviction for "second degree attempted murder," and the court's subsequent modification of the judgment to omit "second degree" violated due process because there is no such crime as "second degree attempted murder," and (2) the trial court erred in giving CALCRIM No. 3450. Each claim is analyzed in turn below.

1.   "Second Degree Attempted Murder"

Petitioner claims that it is impossible to determine whether the jury convicted him of attempted murder under a legally inadequate theory. During deliberations, the jury deadlocked on the issue of what degree of attempted murder Petitioner was guilty in Count 2. RT 1044-46. The jury noted that it had difficulty determining how Petitioner's impaired mental state affected his ability to act deliberately. RT 1058. Thereafter, the prosecutor moved to dismiss the allegation of attempted first degree murder in Count 2. RT 1102. The jury then returned with a verdict of guilty for attempted murder in the second degree. RT 1111.

Petitioner argues that the crime "second degree attempted murder" is non-existent, and that the state court's subsequent modification of the conviction into "attempted murder" overlooks the fact that the jury likely did not unanimously agree that Petitioner acted deliberately, which is a required element for attempted murder.

The state appellate court rejected this claim, explaining:

> Applegate asserts that the jury found him guilty of attempted murder in the second degree based on a theory of guilt that "'fails to come within the statutory definition of the crime.'" "'[A]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.]" (People v. Smith (2005) 37

Cal.4th 733, 739 (Smith); see also People v. Swain (1996) 12 Cal.4th 593, 605.) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.'" (Smith, at p. 739, quoting People v. Saille (1991) 54 Cal.3d 1103, 1114.) "'The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice - a conscious disregard for life - suffices. [Citations.]'" (Smith, at p. 739.)

The court here did not instruct the jury on "first degree" or "second degree" attempted murder. Instead, it properly instructed the jury on attempted murder and on the allegation of willfulness, deliberation and premeditation under section 664, subdivision (a). "To prove that the defendant is guilty of attempted murder, the People must prove that, one, the defendant took direct but ineffective steps toward killing another person; and, two, the defendant intended to kill that person. [¶] A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation. It shows that a person is putting his or her plan into action. . . . [¶] . . . [¶] If you find the defendant guilty of attempted murder under count two, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully and with deliberation and premeditation. . . . [¶] . . . [¶] An attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant killed a person because he acted in imperfect defense of another." The court further instructed the jury that "[a]ttempted murder without premeditation and deliberation and attempted voluntary manslaughter are lesser crimes of attempted murder charged in count two."

Applegate does not claim that the jury was misinstructed. Instead, he asserts that his conviction must be reversed because it is impossible to tell whether the jury convicted him of attempted murder under a "legally adequate theory." He urges that "the jury failed to unanimously agree that [he] acted deliberately which is a required element for attempted murder." This element, however, is not necessarily required. The mental state required for attempted murder is intent to kill. (Smith, supra, 37 Cal.4th at p. 739.) Intent, however, does not require deliberation. (See People v. Thomas (1945) 25 Cal.2d 880, 898.) "'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action. . . .'" (People v. Harris (2008) 43 Cal.4th 1269, 1286, quoting People v. Koontz (2002) 27 Cal.4th 1041, 1080.)

Contrary to Applegate's claim, the jury's verdict of attempted murder in the second degree was not based on a legally inadequate theory, but on an inadequate verdict form. Once the court advised the jury that the "first-degree charges have been dismissed and . . . you are to no longer consider the issue of

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.10\Applegate04774_deny petition-coa.wpd

> first-degree murder nor attempted first-degree murder," the jury's only options on the verdict form were attempted murder in the second degree or attempted manslaughter. "[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice." (People v. Webster (1991) 54 Cal.3d 411, 447, citing §§ 1258, 1404; People v. Camacho (2009) 171 Cal.App.4th 1269, 1272-1273.)
>
> The jury was properly instructed on attempted murder, including the critical instruction that an intent to kill is required, and Applegate does not contend otherwise. Given the option between attempted murder "in the second degree" and attempted voluntary manslaughter, the jury plainly applied the instructions and rejected the imperfect defense of another theory. The court's dismissal of the allegation that the attempted murder was premeditated and deliberate, in the form of dismissal of the "first-degree charges," did not remove a "required element for attempted murder" from the jury. Given the accurate instructions to the jury that attempted murder required an intent to kill, the theory of guilt presented to the jury was not legally inadequate.

Resp. Ex. 6 at 6-8.

A person in custody pursuant to the judgment of a state court can obtain a federal writ of habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). In other words, "it is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts." Wilson v. Corcoran, 131 S. Ct. 13, 16 (2010). The Supreme Court has repeatedly held that federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law. See Swarthout v. Cooke, 131 S. Ct. 859, 861-62 (2011). It is unavailable merely because "something in the state proceedings was contrary to general notions of fairness or violated some federal procedural right unless the Constitution or other federal law specifically protects against the alleged unfairness or guarantees the procedural right in state court." Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).

Here, Petitioner's main argument is that the jury could not decide whether Petitioner acted deliberately, which was an element of attempted murder. However,

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.10\Applegate04774_deny petition-coa.wpd

1  the state appellate court noted that, in fact, deliberation was not a necessary element
2  of attempted murder. "Attempted murder requires the specific intent to kill and the
3  commission of a direct but ineffectual act toward accomplishing the intended
4  killing." People v. Superior Court, 41 Cal.4th 1, 7 (2007). Although the crime of
5  attempted murder is not divided into degrees, People v. Smith, 37 Cal.4th 733, 741
6  (2005), the prosecution may seek a jury finding that an attempted murder was
7  "willful, deliberate, and premeditated" for purposes of a sentence enhancement. Id.
8  at 740, People v. Bright, 12 Cal.4th 652, 669 (1996), overruled on other grounds by
9  People v. Seel, 34 Cal.4th 535 (2004). Notably, Petitioner did not receive such a
10 sentence enhancement.

11    As the California Court of Appeal observed, Petitioner does not argue that the
12 jury instructions regarding attempted murder were erroneous or insufficient. Nor
13 does Petitioner claim that the appellate court's definition of attempted murder was
14 wrong. In addition, Petitioner did not object to the form of the verdict in trial court.
15 In short, outside of Petitioner's erroneous assumption that deliberation is a required
16 element of "attempted murder," Petitioner does not identify how the post-conviction
17 amendment of his judgment from "second degree attempted murder" to "attempted
18 murder" has violated his federal constitutional rights.  See Langford v. Day, 110
19 F.3d 1380, 1389 (9th Cir. 1996) (recognizing that a petitioner may not "transform a
20 state-law issue into a federal one merely by asserting a violation of due process.").

21    Nonetheless, even assuming that a post-conviction modification of judgment
22 resulted in constitutional error, in light of the fact that the jury instructions regarding
23 attempted murder were correct, RT 879-80, and Petitioner does not challenge that
24 the jury found the required elements of (1) a specific intent to kill, and (2) the
25 commission of a direct but ineffectual act toward accomplishing the intended killing,
26 the Court concludes that such error did not have a substantial or injurious effect on
27 the verdict.  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.10\Applegate04774_deny petition-coa.wpd

2. CALCRIM No. 3450

Petitioner claims that his right to a fundamentally fair trial was violated when the trial court gave jury instruction CALCRIM No. 3450, which directed the jury to assume that he was legally sane when he committed the crimes if the jury concluded that "at times [Petitioner] was legally sane and at other times the [Petitioner] was legally insane."[1] RT 1127. Petitioner states that because the evidence showed that periods of psychosis wax and wane, CALCRIM No. 3450 effectively directed a verdict in the sanity trial.

The state appellate court rejected this claim:

> "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (People v. Burgener (1986) 41 Cal.3d 505, 538, overruled on another ground in People v. Reyes (1998) 19 Cal.4th 743, 756.) "In evaluating a claim that the jury could have misconstrued an instruction, the test on review is '"'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."'" (People v. Thomas (2007) 156 Cal.App.4th 304, 310 (Thomas), quoting People v. Raley (1992) 2 Cal.4th 870, 901.)
>
> Applegate maintains that because "virtually every mentally ill person has some lucid moments . . . this instruction effectively directed a verdict in the sanity trial that [he] was sane at the time of the offense." The court in Thomas considered the same contention. There, the defendant likewise claimed that "because virtually all mentally ill persons have lucid moments, the [portion of CALCRIM No. 3450] effectively directed a finding of sanity." (Thomas, supra, 156 Cal.App.4th 304 at p.309.) The court held: "When viewed in isolation, we agree . . . the highlighted portion of the instruction could be misleading. The point of the instruction is to inform the jury the burden is on the defendant to prove he was insane at the time of the offenses. This does not change after evidence has been presented that the defendant was sane or insane at different times, including the time of the offense. Therefore, no good can come from informing the jury that, once evidence has been presented that the defendant was sane at times and insane at other times, it must assume he was sane at the time of the offenses. This assumption existed before evidence was presented. Thus, there is the risk the jury might read the highlighted portion to mean the assumption is irrebuttable. [¶]

---

[1] CALCRIM No. 3450 was amended in 2008, and no longer contains that sentence.

> Nevertheless, when the instruction is viewed as a whole, we do not find a reasonable juror would have been misled." (Id. at p. 310.)
>
> Here, the court instructed regarding insanity, in pertinent part, as follows: "The defendant must prove that it is more likely than not that he was legally insane when he committed the crimes. [¶] The defendant was legally insane if, one, when he committed the crimes he had a mental disease or defect; and, two, because of that disease or defect, he did not know or understand the nature and quality of his act, or did not know or understand his act was morally or legally wrong. None of the following qualify as mental disease or defect for the purposes of an insanity defense: [¶] Personality disorder, adjustment disorder, seizure disorder, or abnormality [sic] personality character made apparent only by a series of criminal or antisocial acts. [¶] If the defendant suffered from a settled mental disease or defect caused by long-term use of drugs or intoxicants, that long-settled mental disease or defect is one that remains after the effect of the drugs or intoxicants has worn off. [¶] You may consider any evidence that the defendant had a mental disease or defect before the commission of the crimes. If you are satisfied that he had a mental disease or defect before he committed the crimes, you may conclude that he suffered from that same condition when he committed the crimes. [¶] You must decide whether that mental disease or defect constitutes legal insanity. . . . [¶] . . . [¶] You must not speculate as to whether he is currently sane or may be found sane in the future. . . . [¶] If you conclude that at times the defendant was legally sane and at other times the defendant was legally insane, you must assume that he was legally sane when he committed the crimes. [¶] If after considering all the evidence the twelve of you conclude the defendant has proved that it is more likely than not that he was legally insane when he committed the crimes, you must return a verdict of not guilty by reason of insanity. Regardless of its duration, legal insanity which existed at the time of the commission of the crime is a defense to the crime. [¶] When the evidence shows that at times the defendant was legally insane and at other times he was legally sane, he has the burden of proving by a preponderance of the evidence that he was legally insane at the time of the commission of the crime."
>
> While the court instructed the jury with the portion of CALCRIM No. 3450 that the Thomas court found "could be misleading" in isolation (Thomas, supra, 156 Cal.App.4th 304 at p. 310), the parties do not dispute that the remaining instructions accurately stated the law on insanity. The instructions made clear that "[r]egardless of its duration, legal insanity which existed at the time of the commission of the crime is a defense to the crime." Considering the charge to the jury in its entirety, we conclude that no reasonable juror would have misconstrued the instructions.

Resp. Ex. 6 at 8-10.

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.10\Applegate04774_deny petition-coa.wpd

A claim of instructional error requires federal habeas relief only where the error "'by itself so infected the entire trial that the resulting conviction violates due process.'" Estelle v. McGuire, 502 U.S. 62, 71-72 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). An instructional error will violate due process only when there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution, see Estelle, 502 U.S. at 72, and where the erroneous instructions had a substantial and injurious effect on the verdict, see Brecht, 507 U.S. at 637-38. The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72.

The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged. In re Winship, 397 U.S. 358, 364 (1970). This constitutional principle prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime. See Yates v. Evatt, 500 U.S. 391, 400-03 (1991); Carella v. California, 491 U.S. 263, 265-66 (1989); see, e.g., Francis v. Franklin, 471 U.S. 307, 309 (1985) (finding unconstitutional an instruction stating, "[t]he acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted" because "a reasonable jury could have understood the challenged portions of the jury instruction . . . as creating a mandatory presumption that shifted to the defendant the burden of persuasion on the crucial element of intent."); Sandstrom v. Montana, 442 U.S. 510, 512, 520-24 (1979) (finding a jury instruction stating "the law presumes that a person intends the ordinary consequences of his voluntary acts" to be unconstitutional).

Here, the challenged jury instruction was given during the sanity phase of

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.10\Applegate04774_deny petition-coa.wpd

13

trial rather than the guilt phase. Thus, although in Sandstrom and Francis, the Supreme Court found jury instructions to be unconstitutional because they shifted the burden of proof regarding intent to the defendant, in this case, the issue of Petitioner's legal sanity was not an element necessary to convict Petitioner of the crime. See People v. Hernandez, 22 Cal.4th 512, 522 (2000) ("Insanity is a plea raising an affirmative defense to a criminal charge, although one that does not negative an element of the offense."). In fact, under California law, "[t]he party claiming that [he] . . . 'is' or was insane has the burden of proof on that issue." Pop v. Yarborough, 354 F. Supp. 2d 1132, 1137 (C.D. Cal. 2005). In other words, "[a]t the sanity phase of a trial, there is a rebuttable presumption the defendant was sane when the crime was committed, and it is his burden to prove otherwise by a preponderance of the evidence." Id. Indeed, the Supreme Court has found state statutory schemes which burden the defendant with proving insanity do not violate the Fourteenth Amendment's due process guarantee. Leland v. State of Oregon, 343 U.S. 790 (1952) (upholding Oregon statute requiring defendant to prove insanity beyond a reasonable doubt, once commission of crime has been proven).

Stark v. Hickman, 455 F.3d 1070 (9th Cir. 2006) and Patterson v. Gomez, 223 F.3d 959 (9th Cir. 2000), although distinguishable, provide further discussion. In both cases, the Ninth Circuit found that a jury instruction that the jury was to conclusively presume petitioner was sane – a crucial element of the state's burden of proof to show intent, was unconstitutional. In both cases, the Ninth Circuit could not reconcile the presumption of sanity instruction with the State's burden to prove intent. However, in contrast to the underlying action, the jury instructions in Stark and Patterson were given during the guilt phase of trial rather than the sanity phase. Here, the trial court did not discuss the issue of insanity until after a guilty verdict had been returned by the jury, thereby lessening the possibility of confusing the jury. Further, during the sanity phase of trial, the trial court instructed the jury on the legal

definition of sanity, and there was no need to try to reconcile an instruction of the presumption of sanity with Petitioner's attempt to prove a lack of intent to commit a crime. The Ninth Circuit suggested that the presence of either factor in Stark or Hickman, would have countered a likelihood that a reasonable juror would misapply the instruction. See, Stark, 455 F.3d at 1078; Patterson, 223 F.3d at 966-67.

Finally, even assuming that the challenged portion of CALCRIM No. 3450 could have reasonably been understood as creating a presumption that relieved the State of its burden, see Francis, 471 U.S. at 315, viewed in light of the instructions as a whole, CALCRIM No. 3450 did not violate Petitioner's constitutional rights. As the state appellate court noted, the trial court instructed the jury on the definition of legal insanity; emphasized that it was Petitioner's burden to prove by a preponderance of the evidence that he was legally insane at the time he committed the crime; and instructed the jury that it must determine whether Petitioner was legally insane when he committed the crime. The jury was also instructed with CALJIC No. 4.04, which stated that if the evidence demonstrated that Petitioner was legally sane at times and legally insane at other times, Petitioner had the burden to prove that he was legally insane at the time of the crimes. Thus, even assuming that the jury instruction forced the jury to assume that Petitioner was sane, the remainder of the jury charge explicitly informed the jury that the burden was on Petitioner to prove by a preponderance of the evidence that he was legally insane at the time of the crime.

The state appellate court concluded that, viewed in context with the rest of the jury instructions during the sanity phase, the jury could not have misconstrued the challenged sentence in CALCRIM No. 3450 as an impermissible mandatory presumption. See People v. Thomas, 156 Cal.App.4th 304, 310 (2007); cf. Carella, 491 U.S. at 265 ("courts should ask whether the presumption in question is mandatory, that is, whether the specific instruction, both alone and in the context of

the overall charge, could have been understood by reasonable jurors to require them to find the presumed fact if the State proves certain predicate facts"). This Court concludes that Petitioner has not demonstrated that the state court decision was contrary to, or an unreasonable application of, clearly established Supreme Court law.

## CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**. See Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. See Rule 11(a) of the Rules Governing Section 2254 Cases.

The clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

SO ORDERED.

DATED: 9/21/2012   
EDWARD J. DAVILA
United States District Judge

Order Denying Petitioner for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.EJD\HC.10\Applegate04774_deny petition-coa.wpd

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

THOMAS ARTHUR APPLEGATE,

        Plaintiff,

  v.

KATHLEEN DICKENSON et al,

        Defendant.

Case Number: CV10-04774 EJD

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on _____9/24/2012_____, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Thomas Arthur Applegate V-27045
California Medical Facility
P. O. Box 2500
Vacaville, CA 95696-2500

Dated:  _____9/24/2012_____

        Richard W. Wieking, Clerk
        /s/By: Elizabeth Garcia, Deputy Clerk